## WYNN VS. GARLAND.

A *simple* or *voluntary license* is merely an authority, without reward or consideration to do a particular act or series of acts, on another's land without passing any interest or estate in the soil, and need not be in writing.

Such license is revocable at the pleasure of the grantor; but its revocation will not be allowed, where the grantee has been induced to expend his means or money towards its enjoyment, without re-imbursing him in the amount expended.

An *easement* is a liberty, privilege or advantage, which one man may have in the lands of another, without profit, and must be held under a deed, or other instrument in writing, or by prescription.

But though the grant of an easement is within the statute of frauds, and must be in writing, yet a parol grant executed, will be upheld under the same circumstances, and on the same principles that a parol contract for the sale of land would be—as where the grantee has made improvements in good faith, under the grant, or expended money or capital in its enjoyment.

Where a bill seeks to enforce an agreement for an interest in land, the defendant may

avail himself of the statute of frauds, at the hearing, though he does not set it up as a defence in the answer, or otherwise, if he deny, in his answer, that there was any agreement as charged in the bill—the denial being of a valid agreement which can be enforced under the statute of frauds.

W. and G., being in possession of contiguous unsurveyed public lands, entered into an agreement to dig certain ditches for the purpose of draining them—each to dig a main or line ditch, which were to constitute and continue the permanent bound-aries between their lands—the line ditches to unite, and thence a main ditch to be dug by them, jointly, to a certain point, to carry off the water from the lands of both: the ditches were dug according to their agreement: afterwards, upon the lands being surveyed by the government,—the lines of the public survey differing from those agreed upon—each proceeded to enter such lands as he could secure for his own use regardless of the boundaries agreed upon: W. obtained title to the tract through which the main ditch was cut, closed the ditch and threw up an embankment, so as to obstruct the water, and back it upon the lands of G.: *Held,* That though the agreement was for an interest or privilege in land and rested in parol, the perform-ance on the part of G. constituted it an executed contract, and that W. had no right to close the ditch: that the acts of both in entering the lands without regard to the previously agreed lines, was a mutual abandonment of the agreement as to the boundaries between them, but did not affect the executed agreement as to the ditches.

Where one party has performed a valuable part of an agreement and is in no default for not performing the residue of the agreement to be performed by him, a Court of chancery will decree a specific execution of the other part of the contract: or may modify it where, from a change of circumstances, its terms are incapable of being strictly complied with.

### *Appeal from Lafayette Circuit Court in Chancery.*

The Hon. John Quillin, Circuit Judge.

Pike & Cummins, for the appellant, contended that the right claimed here is a servitude, an interest, or incorporeal heredita-ment in real estate, lying in grant, and which can pass only by writing, under the statute of frauds: that to this right is attached, as incident thereto, a right of entry on the servient tenement, and of passage, to remove obstructions and keep open the drains for the water: that the *natural* right of drain can only extend so far as that the owner of the servient estate is bound to let the *rain* water flow off *naturally* from the dominant tenement, the owner of which has no right to make ditches to carry it off, or concentrate it by any artificial means at one or more points:

and that this right only exists as to lands in their *natural* condition: that the. owner of an estate subject to overflow from a river has a perfect right to levee his land against inundation; and of this no other person can complain, no matter how much he is injured by it. *Bryan vs. Whistler*, 8 *B. &. C.*, 293; *Cocker vs. Cowper*, 1 *Cr. Mees. & Rose*, 418; *Cooke vs. Stearns*, 11 *Mass.* 533; *Dyer vs. Sanford*, 9 *Metc.* 402; *Boston Water Power Co. vs. Boston and Worcester Railroad Co.*, 16 *Pick.* 522; 18 *Pick.*, 343; 21 *Pick.*, 342; 12 *Mass.* 69; 5 *Greenl.* 9; *Munford vs. Whitney*, 15 *Wend.* 384; *Miller vs. Auburn & Syracuse R. R. Co.*, 6 *Hill* 61; 2 *Barb. Ch. R.* 331; *Raousset-Dalbon vs. DeGraveson*, 14 *Journ. de Pal.* 571, *Duranton, liv.* 2 *Tit.* 4, *sec.* 141; *Martin vs. Jett*, 12 *Louis.* 501; 13 *Ib.* 54; 14 *Ib.* 161; 21 *Journ. de Pal.* 313; 54 *Ib.* 41; 52 *Ib.* 425.

That the complainant having set up an agreement which was invalid under the statute of frauds, not being in writing, it was not necessary for the defendant to insist upon the statute, in his answer, as he denied the agreement, but that it was incumbent upon the complainant, at the hearing, to establish the agreement by written evidence. *Ontario Bank vs. Root*, 3 *Paige* 478; *Cozine vs. Graham*, 2 *Paige* 177; *Coles vs. Boure*, 10 *Paige* 535; *Jervis vs. Smith*, 1 *Hoff.* 470; 5 *Wend.* 643.

That the decree in this case must be reversed upon the plain ground that the alleged acts of part performance, upon which the complainant mainly relies, do not unequivocally evidence a contract " that the ditches should be the dividing lines between the parties forever, and each have always the right to drain his land through them." 2 *Story's Eq.* 765; *Lindsay vs. Lynch*, 2 *Sch. & Lef.* 7; *Forster vs. Hale*, 3 *Ves. p.* 712; *Cooth vs. Jackson*, 6 *Ves.* 37; *Moore vs. Edwards*, 4 *Ves.* 23; *Phillips vs. Thompson*, 1 *J. C. R.* 149; *Parkhurst vs. Van Cortlandt*, 1 *J. C. R.* 283; *Grant vs. Naylor*, 4 *Cranch* 235; 2 *Barb. Ch. R.*, 222; 1 *Hoff.*, 474; 5 *Wend.* 644; *Roberts on Frauds*, 135.

The common law Courts held, in *Hewlins vs. Shippam*, 5 *Barn. & Cres.* 221, and *Fentiman vs. Smith*, 4 *East* 107, and other cases, that a right of drain, and other like incorporeal hereditaments,

if not created by deed or writing, but merely resting in parol, are rights at will only, mere licenses, revocable at pleasure: that though such a parol license might be an excuse for a trespass, until countermanded, it could be put an end to at any time.

The same decision was made in *Prince vs. Case*, 10 *Conn.* 375. *Dexter vs. Hazen*, 10 *J. R.* 246, and in *The King vs. The Inhabitants of Horndon on the Hill*, 4 *M. & S.* 562. *Wood vs. Leadbetter*, 13 *Mees. & Wels.* 838. *Mumford vs. Whitney*, 15 *Wend.* 380. *Miller vs. Auburn Railroad Co.*, 1 *Hill* 61. *Hayes vs. Richardson*, 1 *Gill & John.* 366.

And it is well settled that though such a parol license can create no interest in the land, yet it is a sufficient justification for all acts done while it is in force, and unrevoked; and may be relied on as such, *Clement vs. Durgin*, 5 *Greenl.* 9. *Miller vs. The Auburn & Syracuse Railroad Co.*, 6 *Hill* 64. *Wallis vs. Harrison*, 4 *Mees. & Wels.* 538. *Parsons vs. Camp*, 11 *Conn.* 525. *Heeny vs. Heeny*, 2 *Denio* 625.

It has become settled doctrine, also, in America that if an owner of land gives another person a license to erect a house, mill, bridge or abutment on his land, he may indeed revoke the parol license of way, etc., and so prevent the *use* of the structure, but he cannot appropriate it to himself. It is personal property, and if he meddles with it he is liable in trespass. Such was the decision in *Rucker vs. Kelly*, 1 *Greenl.* 117, and in *Ameriscoggin Bridge vs. Bragg*, 11 *N. Hamp.* 102: and such is the effect of a great many other American decisions.

And this being the law; and as it is settled doctrine that a revocable parol license may be proven at law, as a defence against an action of trespass on the case, to show the act complained of to have been lawful, there is no foundation for the doctrine of part-performance in such a case.

Surely if the Courts ought not to go beyond the former adjudications, nor extend the doctrine beyond the former cases, it will never be extended to incorporeal hereditaments.

And again, the acts of part performance alleged here, are entirely too trifling and unimportant to be considered such with

seriousness. It does not appear what was the labor or expense of digging the ditches.

The agreement, in its entirety, must be enforced, if any specific performance is to be decreed. The part performance must be sufficient to take the whole agreement out of the statute. A Court of chancery will not decree a specific performance unless the whole agreement can be enforced; 2 *Dow P. C.* 274; *Bat. on Spec. Perf.* 64; nor where it would not be strictly equitable to make such decree; nor where from a change of circumstances it would be unconscientious to enforce the agreement; nor where the remedy is not mutual and reciprocal. 2 *Story's Eq. sec's* 736, 742, 750, 751, 723, 790; 1 *Sim. & Stu.* 174; *ib.* 607. 1 *Sch. & Lef.* 13; 2 *A. K. Marsh.* 246; *J. C. R.* 282.

WATKINS & GALLAGHER, for appellee.

Though that portion of the agreement between the parties relating to the boundaries was made under a mistake, a mutual mistake as to their rights, and not enforceable, the residue of it may be enforced, and is susceptible of being performed. A partial performance may be decreed, with a ratable deduction for deficiency, where the contract has been made under a mutual mistake, as to the quantity to which the vendor had title. *Voorhees vs. DeMeyer,* 3 *Sand. Chy.* 614. So in *Weatherford vs. James,* 2 *Ala.* 173, citing *Lawrenson vs. Butler,* 1 *Sch. & Lefroy* 13, the doctrine is broadly laid down, that the Court will not hear objections from the vendor that the entire contract cannot be performed by him. See also, *Bass vs. Gilliland,* 5 *Ala.* 761; *Wiswall vs. McGowan,* 1 *Hoff. Chy.* 125; *Jones vs. Shackleford,* 2 *Bibb,* 410; *Williams vs. Champion,* 6 *Hammond* 78; *Waters vs. Travis,* 9 *John.* 464.

Specific performance of agreements in whole or in part is a peculiar subject of equity jurisdiction, depending upon discretion according to the nature of the agreement, the equitable circumstances attending it, and the situation of the parties.

Can the appellant have any benefit from the statute of frauds, without having relied upon it in pleading? But whatever be

the effect of denying the agreement, without relying upon the statute, the case is of course taken out of the operation if a part execution be shown.

Disregarding the agreement altogether as an *easement*, sufficient is alleged in the bill and proven, to uphold it as a parol license to cut the ditches. As a mere parol license, and even if beneficial only to one party, it could not be revoked, under the circumstances, at the pleasure of the party granting the license, without compensation to the other, or placing him in as favorable a position. *Ricker vs. Kelly*, 1 *Greenlf.* 117; *Clement vs. Deugan*, 5 *Ib.* 9; *Woodbury vs. Parshley* 7 *New Hamp.* 23; *Ameriscoggin Bridge vs. Bragg* 11 *Ib.* 102; *Dorrance vs. Simons*, 2 *Root* 208; *Le Foore vs. Le Foore*, 4 *Serg. and R.* 241; *Rurick vs. Kern*, 14 *Ib.* 267; *Sheffield vs. Collier*, 3 *Kelly* (*Ga.*) 82—the latter case citing *Webb vs. Paternoster, Palmer* 71; *Wood vs. Lake, Sayer* 5; *Taylor vs. Waters*, 7 *Taunt.* 374; *Wood vs. Manly*, 11 *Adol. & Ellis* 34; *Wood vs. Leadbetter*, 13 *Meeson & Wels.* 838; *Winter vs. Brockwell*, 8 *East* 308; *Liggins vs. Inge*, 7 *Bing.* 682; *Wallis vs. Harrison*, 4 *Mees. & Wels.* 538. The distinction is between a parol license *executed* and executory—so clearly taken and illustrated in the opinion in *Sheffield vs. Collier*, 3 *Kelly*, that this case might rest upon that decision alone.

There is no distinction in principle, between a parol license of this sort executed, and a parol agreement for the sale of land or any easement upon it, where the complete execution or even partial performance of the agreement would take it out of the operation of the statute of frauds.

Mr. Justice HANLY delivered the opinion of the Court.

This was a bill for injunction, brought by Josiah Garland, on the 26th January, 1846, against William Wynn, on the chancery side of the Lafayette Circuit Court.

The facts of the case, as far as it is material to state them, are as follows:

In 1836, Garland and Wynn were in possession, and claimed to be the owners of contiguous plantations in Fisher's Prairie,

on the west side of Red river. They held actual possession of the lands composing their respective plantations, by such title as could, at that time, be acquired by the purchaser of improvements on public lands. The plantation of Wynn joined that of Garland on its south and west side. The north and south line between them was a conditional or agreed line, being the west boundary of an old Spanish survey, running nearly through the middle of the NE. and SE. quarters of section 18—so that Wynn resided within, and claimed up to that line on the west side, and Garland, in like manner, on the east side of it, and between Wynn and Red river. The south-west corner of Garland's plantation was in the NE. quarter of section 19, near the north side, and about the middle of it. The land on both plantations was so level as to require drainage for their mutual convenience and benefit. Under this state of facts Wynn and Garland agreed in parol (not in writing,) upon a plan or system of drainage, which they conceived was calculated to answer the purposes desired, and which they, at the time, supposed was the only plan by which this could be accomplished. Their agreement was, in substance, that Garland should dig a leading or line ditch on the south side of his plantation, and that Wynn should dig a similar one on the east side of his. These ditches were to run together at a low place in the prairie, at the south west corner of Garland's field, in the NE qr. of 19, and from this point the parties were to join their forces, both having many slaves, in digging a main ditch of sufficient dimensions to carry off all the water, which might accumulate there, in a southerly direction, upon some low timbered lands which were vacant or unoccupied. Each party had the right, by this agreement, to drain his own lands by means of smaller ditches running into the leading or line ditches. Garland was to construct and keep open the one on the south side of him; and Wynn was to construct and keep open the leading or line ditch running north and south. The main ditch was to be a community ditch, and kept up by them jointly. Their ditches were to be permanent, and constitute the boundaries between their respective planta-

tions. It appears that the ditches in question were made in pursuance of this agreement, and were enjoyed by the parties for some time after completion, without molestation or trouble from either party, during which time they were found to answer a very good purpose to both, and were mutually beneficial to them.

In the year 1840, the region of country, in which the plantations of Garland and Wynn were situated, was caused to be surveyed by the United States, and in the early part of the year 1843, those lands came into market. It was not until after this survey that the locality of the two plantations, in reference to to each other, and of their lines and ditches, as before described, was or could be definitely ascertained. Then it was, discord and enmity arose between the parties, caused by the fact that a portion of the lands embraced in their plantations, was taken from them, respectively, by means of the lines of the United States survey, which had been made posterior to their agreement in reference to the ditches, and the perpetual lines determined upon thereby.

Wynn proved a pre-emption, under the act of 1838, to the N. E. qr. of 18, and on the next day Garland proved one to the same tract, under the act of 1830. Garland proved a pre-emption to the E$\frac{1}{2}$ of the SE$\frac{1}{4}$ of 18 and the E$\frac{1}{2}$ of the NE$\frac{1}{4}$ of 19. Wynn entered and paid for the NE$\frac{1}{4}$ of 18, and got a certificate of entry for it; but Garland, afterwards, got a certificate for it: Wynn's entry was canceled, and Garland got the patent. Garland entered and paid for the east halves of the SE$\frac{1}{4}$ of 18 and the NE$\frac{1}{4}$ of 19, and obtained a certificate for them; but Wynn also proved a pre-emption, in the right of one Jones, to the SE$\frac{1}{4}$ of 18, entered it, paid for it, and got a certificate, and Garland's entry was canceled, on the grounds that Jones' pre-emption to that quarter was valid, and as to the rest, that as Garland already owned 320 acres of land, he could have no pre-emption for any more. So Wynn obtained a patent for the SE$\frac{1}{4}$ of 18, and purchased the E$\frac{1}{2}$ of the NE$\frac{1}{4}$ of 19, from the State of Arkansas, as a part of the Seminary land, and obtained a deed for it.

Before the bill was filed, Wynn removed the division fence, and placed it near the line between sections 17 and 18, and between sections 17 and 19. Garland was, in February, 1846, put in possession, by means of some legal process, of the land he had before cultivated in sec. 18; but Wynn again took possession of it, and has ever since been, and still is, in peaceable possession of the NE and SE quarters of section 18, and the E½ of the NE¼ of section 19. After Wynn so removed his fence, he dug a ditch outside of it, close to the line of sections 17 and 18, but wholly on 18, and with the earth from it threw up an embankment which stopped up Garland's small ditches, and they still remain so stopped.

The writ of injunction ordered Wynn not to stop up *the main ditch*. This " main ditch" commenced in the NW¼ of section 19, and ran southwardly. In 1839, Wynn had it stopped and it ever after remained so.

Up to the time that Wynn removed the fences, Garland cultivated on the NE¼ of sec. 18, from 17 to 20 acres; on the SE¼ of 18, from 12 to 18 acres, and on the E½ of the NE¼ of 19, from one to two acres.

On this state of facts the Court decreed the relief prayed for: that Garland's right to drain his land through the ditches made in 1836, by means of his small or cross ditches then cut; and perpetually enjoined Wynn from interfering with this right, and also decreed that Garland should, at all times, have the right of entry on, and passage over Wynn's land, to remove obstructions in the ditches and keep them open.

It appears that the small or cross ditches are three or four in number, all running westwardly from Garland's land, in section 17 into the SE¼ of 18. None of them, it appears, go into the NE¼ of 18.

From the decree rendered in the cause, Wynn appealed to this Court, upon which the questions presented are to be adjudicated.

The questions raised by the counsel and legitimately growing out of the case, as stated, may be propounded as follows:

1st. What is the nature of the right claimed by the bill, and allowed by the decree? Is it an easement, or servitude, or is it a mere license; and is it not such an interest in lands, as can, under the statute of frauds, pass only by writing?

2d. Wynn not having relied on the statute of frauds by his answer or plea, can he have the benefit of the objection, that the contract is proved to have been made merely orally—he having absolutely denied the agreement?

3d. Does the doctrine of part performance apply to such a case; and if so, do such facts exist as amount to part performance?.

4th. Is there mutuality in the agreement, which will authorize a Court of chancery to enforce it?

It must be conceded that several of these questions are fraught with difficulty, on account of their comparative novelty and intrinsic embarrassment, resulting, in part, from the fact, that several prominent cases, which appear both in the English and American Reports, in which several of the points that arise in this investigation occur, have been reversed, or else seriously questioned by later, and, what have been considered, more authoritative adjudications, coupled with the additional fact, that the doctrine of the common law, on the subject of *easement*, is derived from the civil law treating of *servitudes*, with which we do not profess to be familiar.

We propose to take up and consider the questions propounded, in their order as they occur.

*First.* The nature of the right, claimed by the bill and allowed by the decree, is that of an easement, technically speaking, and not a mere or simple license, used in the same acceptation.

The term *simple license*, used in this sense, has been, and may be variously defined. The definition, which we most approve, is that of Mr. Justice GIBSON, in *Rerick vs. Kern* (14 *Serg. & R.* 271.) He says, that a *simple* or *voluntary license* is merely an authority, without reward or consideration, to do a particular act, or series of acts on another's land, without passing any in-

terest or estate in the soil. And this definition is concurred in by Chancellor Kent, (3 *Kent's Com.* 452.) and Chief Justice Parker, in *Cook vs. Stearns* (11 *Mass. Rep.* 537.)

A simple or voluntary license need not be in writing, for the reason, that it is not within the first section of the statute of frauds. See 1 *Sug. on Vend.* 106 *note* 1; *Winter vs. Brockwell,* 8 *East Rep.* 308; *Rex vs. Inhabitants of Stanton,* 2 *M. & Selw.* 461; *Taylor vs. Walters,* 2 *Marsh.* 351; 7 *Taunt.* 74; *Wood vs. Manly,* 11 *Ad. & Ell.* 34; *Rex. vs. Inhabitants of Horndon,* 4 *M. & Selw.* 562; *Lefever vs. Lefever,* 4 *Serg. & Rawle* 241.

This kind of license, it is said, is revocable at the pleasure of the party granting it; but not, however, to make the grantee responsible in trespass, or any other form of action, for acts committed on the land in pursuance of the license. See *Cloflin vs. Carpenter,* 4 *Metc. Rep.* 583; *Nettleton vs. Sikes,* 8 *Ib.* 34; *Wood vs. Manly, ubi. sup.; Whitemarsh vs. Walker,* 1 *Metc. Rep.* 313; *Sheffield et al. vs. Collier,* 3 *Kelly's (Ga.) Rep.* 85. It is also said that though a license is revocable as above stated, yet the party granting it will not be allowed to do so, if the grantee has been induced to expend his means, or money, towards its enjoyment, without re-embursing or making him whole in the amount thus appropriated. See *Rerick vs. Kern, ubi sup.; Prince vs. Case,* 10 *Conn. Rep.* 375, 383; 2 *Amer. Lead. Cases (by Hare & Wallace)* 514, *note and authorities therein cited.*

An *easement,* in contradistinction to a *simple* or *voluntary license,* is defined to be, a liberty, privilege, or advantage, which one man may have in the lands of another without profit, and it may arise by deed or prescription. See 1 *Bouv. Dict.* 501; 1 *Serg. & R.* 298; 5 *Barn. & Cres.* 221; 3 *Ib.* 339; 3 *Bing. Rep.* 118; 3 *McCord Rep.* 131, 194; 2 *Ib.* 451; 14 *Mass. Rep.* 49; 3 *Pick. Rep.* 408; 14 *Serg. & R.* 271.

From this definition of an easement it follows, therefore, that it can only be communicated by deed, or other instrument in writing, or by prescription, and as a consequence, unless it be claimed by prescription, the privilege, under the statute of frauds, must be evidenced by deed, or some other writing, etc.

See *Sheffield et al. vs. Collier ubi sup.; Shep. Touchstone* 231; 4 *M. & Selw.* 565.

Notwithstanding the grant of an *easement* is embraced within the operation of the statute of frauds, and therefore must be in writing, yet it has been holden, that a parol grant executed will be upheld and sustained under the same circumstances, and on the same principle, that a parol contract for the sale of land would be. See *Ricker vs. Kelly*, 1 *Greenlf. Rep.* 117, and the numerous authorities cited on this point by the counsel for Garland in his brief.

Beside this, where there has been given a parol license of a privilege amounting to an easement, and where the enjoyment of it must necessarily be preceded by the expenditure of money or capital, or where the grantee has made improvements, in good faith, under the grant, or invested his capital in consequence of it—under these circumstances the grantee becomes a purchaser of the easement granted by parol, for a valuable consideration, and consequently will be entitled to have it specifically performed in equity, unless the party will re-imburse him in his expenditure, or pay him for his improvements, provided this will put the grantee *in statu quo*. See *Sheffield vs. Collier*, 3 *Kelly* (*Ga.*) *Rep.* 84 *et seq., and the cases cited above.*

*Second.* In response to this question, we have to say, that though Wynn did not set up the statute of frauds in his answer, or otherwise, still we hold he is not precluded from availing himself of the advantage of the statute of frauds at the hearing, for the reason that he absolutely denied, in his answer, the making of the agreement charged in the bill. If a defendant presents the issue of agreement, or no agreement, the complainant must prove a *valid* agreement. It is where he admits a verbal agreement that he must insist upon the statute of frauds. See *Jarvis vs. Smith*, 1 *Hoff. Rep.* 570; *Harris vs. Knickerbocker*, 5 *Wend. Rep.* 643; *Cozine vs. Graham*, 2 *Peng. Rep.* 181; *Ontario Bank vs. Root*, 3 *Ib.* 478; *Cloes vs. Bourne*, 10 *Ib.* 535; 1 *Mo. Rep.* 660; 22 *Ib.* 33; 3 *A. K. Marsh.* 445.

The appellant having denied the agreement charged in the

bill, the statute of frauds became a question of fact at the hearing. At the hearing it appeared in evidence, that there was such an agreement made as the one charged in the bill, but that it was in parol, and consequently within the statute of frauds in consequence of the character of the interest involved, it being, as we have already held, in the nature of an *easement*, or an interest amounting to an incorporeal hereditament, and consequently should have been evidenced by writing, or else held by prescription. We think, however, there can be no doubt but that the same proof, which established this fact, is very conclusive that the agreement was so far executed, on the part of Garland, as to impose on Wynn the obligation to execute his part thereof, in order to prevent a fraud from being practiced on the former. See *Dorrance vs. Simons*, 2 *Root Rep.* 208; 2 *Story's Eq. p.* 77, *note* 1.

Courts of chancery, notwithstanding it may appear from the evidence, in a case like the one before us, that a contract affecting lands is in parol, will nevertheless decree its specific performance, if it also is made to appear that one of the parties has, in good faith, executed his part of it, and cannot be compensated in damages, or where it would operate as a fraud as to one party; because the specific execution of a contract in equity is a matter not of absolute right in the party who asks it, but of sound discretion in the Court, to which application is made. See 2 *Story's Eq., sec.* 742, 769.

*Third.* As to this enquiry—we have already partially anticipated it. The case of *Sheffield vs. Collier*, 3 *Kelly* (*Ga.*) *Rep.*, before cited, and the several authorities therein referred to, are conclusive on this question. The doctrine of part performance, in reference to parol contracts respecting lands, is well applicable to *licenses executed*, such as we have held the one to be, that we are considering, as far as regards Garland. The circumstances and facts attending this abundantly show that Garland has done all on his part, that he assumed to do, except, possibly, in respect to that part of it, which made the main or leading ditch constructed between the lands claimed by himself

and Wynn in 1836, the perpetual boundary between their lands or plantations, and as to this we think it clear, from the proof, the agreement as to boundary was mutually abandoned in 1843, when their respective claims were made to tracts extending over the conditional line agreed upon in 1836. The parties had the undoubted right to discharge each other from the agreement in 1843, either in whole or in part. If in whole, it was from that time at an end; if in part, the part not affected remained, only, obligatory. It appears from the proof, that though they at one time considered the matter of the conventional line, made by the agreement of 1836, of importance, yet, in 1843, we see them by mutual consent, as it were, setting the agreement aside, so far as it pertained to the conventional boundary. It is evident, we think, that in 1843, they regarded the agreement only as subsisting in reference to the ditches and the privilege of mutual drainage secured thereby. We are at a loss to conceive how there can exist the slightest doubt on this branch of the case.

*Fourth.* Ordinarily, mutuality in contracts is necessary to authorize a Court of chancery to decree a specific performance of them. But it has been laid down, that if a man has performed a valuable part of an agreement, as, in the case before us, that portion of the agreement performed by Garland, and is in no default for not performing the residue, which we have already held to be the case with Garland, in the instance before us, then it is but reasonable he should have a specific execution of the other part of the contract. See *Story's Eq.*, sec. 772.

And where the terms of the agreement have not been strictly complied with, or are incapable of being strictly complied with: still, if there has not been gross negligence in the party, and it is conscientious that the agreement should be performed: and if compensation may be made for the injury occasioned by the non-compliance with the strict terms—in all such cases, Courts of equity will interfere and decree a specific performance. For the doctrine of Courts of equity is, not forfeiture, but compensation. Indeed, in some cases, Courts of equity will decree a specific execution, not according to the letter of the contract,

if that will be unconscientious, but they will modify it according to the change of circumstances. See 2 *Story's Eq.*, sec. 775.

We think the case before us, is one in which the Court might well apply the principle just stated, even were it to modify the agreement in question according to the change of circumstances indicated by the record before us. We have said, however, before, that we have been saved this duty by the conduct and acts of the parties themselves in respect to the change, which they mutually made in the division line between them, indicated by the agreement of 1836, to be perpetuated by the leading or main ditches constructed by them conjointly.

The license to construct the ditches, and the agreement, upon the part of Wynn, that they might and should be used as drains to the plantations of both himself and Garland, indicate very clearly that it was the intention of the parties, that the enjoyment of this license should be perpetual, and we infer this from the nature of the privilege granted, coupled with the condition of the lands intended to be benefited, in reference to their locality, and natural defects designed to be remedied by the ditches as to both plantations.

If Wynn had designed to reserve to himself the power of revoking the license granted by him to Garland, after it was carried into effect, he should have done so expressly at the time the agreement was entered into, or before its execution was commenced on the part of Garland. Not having done so, it must be intended by the Court that it was designed by the parties to be irrevocable. He not only stood by and saw Garland expend his labor, and that of his hands, upon the ditches in question, but absolutely participated with him in constructing them, causing him to expend his means not only upon the small ditches, but that part of the main ditch along his line until it should unite with the one to be constructed by Wynn at the pond or low place in the prairie, and thence on the joint ditch leading into the swamp lying between Red river and the lands of Garland. All this work and labor on the part of Garland and his slaves and servants, must have been of considerable

value.  The stopping up of the ditches by Wynn, at the point designated, would render this labor valueless to Garland, not only so far as it was spent on the lands of Wynn, but likewise, as the proof shows, in respect to those ditches lying entirely on his own lands.  All this, we are constrained to believe, was superinduced by the confidence, which he, Garland, must have reposed in the good faith of Wynn.  If Wynn could be permitted to violate this good faith, to take advantage of Garland, it must be evident that his loss would be irreparable, taking into view the value of his plantation, the importance of drainage, and the certainty of its being impeded by the stoppage of the artificial channels or outlets constructed by the parties in 1836, under the agreement in question.

We regard it as a question of immateriality in this inquiry, whether a part or all the ditches are now, or were, at the time of their construction, on the land of Garland, or whether the license was given to Garland by Wynn to construct them in the first place without consideration; for we have seen that the ditches were made in part by Garland, that the labor bestowed in this way was of value, and that they were made under the agreement and to the knowledge of Wynn, whilst they were progressing; and we have held that the expenditure of money under these circumstances, will be regarded in equity as so much consideration paid by the grantee to the grantor of the license, inducing the expenditure, and has the effect of turning such license into an agreement which will be executed in equity.

Entertaining these views, we are forced to the conclusion, that the decree rendered by the Court below is not only warranted by the facts shown by the record, but sustained and authorized by the law.

Finding no error in the decred it is therefose in all things affirmed.