T. MAGALEI et al., Plaintiffs

v.

R. S. TAGO SIANAVA, Defendant

No. 23-1955

High Court of American Samoa

Civil Jurisdiction, Trial Division

December 30, 1955

ARTHUR A. MORROW, *Chief Judge;* APE, *Associate Judge;* and MAILO, *Temporary Associate Judge.*

Heard at Fagatogo on December 8, 1955 before MORROW, *Chief Judge,* APE, *Associate Judge,* and MAILO, *Temporary Associate Judge.*

Uga, counsel for T. Magalei et al.

R. S. Tago Sianava *pro se.*

OPINION OF THE COURT

MORROW, *Chief Judge.*

On November 14, 1955 T. Magalei together with a number of other chiefs of the village of Faleniu filed their petition seeking the eviction of defendant R. S. Tago Sianava from certain land in the Tualauta County. The land adjoins and lies to the right of the highway from New Mapusaga to New Aoloau. On the day preceding the hearing, the Court viewed the land in the presence of the Chiefs of Faleniu and Tago's sister who lives on it. Tago was notified of his right to be present at the viewing but did not appear.

Chief Moea'i, 76 years old, and Talking Chief Si'ufanua, who is close to 80, both testified that the land involved in this case was originally cleared from the bush by the people of Faleniu about 1922. These Chiefs are from Faleniu. Chief Moea'i testified in part:

"Q   Are you familiar with the land which is the subject matter of the dispute between the chiefs of Faleniu and Tago?

"A   Yes.

"Q   You know who cleared that land from the bush?

"A.   I do.

186

"Q Did you see it cleared?

"A Yes.

"Q Now, when was it cleared?

"A In 1922.

"Q Who cleared it?

"A Us, village of Faleniu.

"Q Now, just what chiefs and young men?

"A All young men they were cutting big trees down are now holding matai names, like Filo, Manu, Nu'u, Sagapolu, Uga and others that are not in court today."

## Si'ufanua testified in part as follows:

"Q Who cleared it (meaning the land involved)?

"A Faleniu.

"Q Well, now, do you know what chiefs of Faleniu or what young men from the village that did it?

"A Yes.

"Q Who were they?

"A These are the people that cut down big trees the first time, Magalei Faapauli, Moeai Sekio, deceased, Muasau Tulaga, and some able men they were old men but able to do the work is Moe Aupiu, Faalafua Tamo, Tuiaana Moi, Iosua Pua'a, and myself when I was a strong man at that time still holding a matai name. Those are the matais. And the young men that helped the chiefs in cutting down trees were the present Uga, Matagi, and the present holder of the title Sagapolu, the present Malufau, the present Manu and some other people who are not in court today.

"Q Well, now, will you tell us, if you can, how it came about that Tago from another village got on that land?

"A His wish.

"Q Well, you tell us what happened, if you know, which resulted in his getting on the land?

"A In 1946 Tago came over to our village of Faleniu trying to check up the people who filed claims for damaged properties during the war. And when Tago came along in that year 1946 on the same day he asked me if I can get the people, the chiefs in my village in the school house. I told Tago I can get the people. Then the people were called and they got together and Tago gone ahead with his work, signed, put down the claims of the village—each individual's claim. Then after that then we had our ava ceremony. Then while after this ava ceremony was through then Tago made a fine speech

to the chiefs. Then at the conclusion of his speech he asked the people of Faleniu that he wants a piece of land of this land now in question to live. Then the village chiefs made a conference with respect to Tago's request. Then it was all agreed by the chiefs of the village to let him have a piece of land for him to live. So all the chiefs give me their opinion that they agree to let Tago have a piece of land and I was the one that talked to Tago about his request telling the wish of the village. Then I was the one that answer the speech of Tago and I told Tago your wish is granted by the village. We will give you a piece of land to put in your plantations. It was his wish. But it was not the wish of the village to give away to give outright. Then Tago thanked the village of Faleniu then again Tago requested us that day that he wanted a piece of land for me to plant taros, bananas, giant taros for the use of his immediate family and maybe for the use of the Faleniu chiefs in the future. And I and talking chief Moeai and another chief Filo went up to the place and this was the same place that I pointed out to Tago for him to live and plant his plantations. And before the first house was put up Tago also requested me that he want just a small house for him to rest while he go and work in the plantation and come and rest. I told Tago, all right, but I have to tell the young men of the village to come and build a house for you. Our village didn't ask for any payment for building the house for the young men, but Tago in his own heart feels that he should give something for the chiefs and young men. So Tago offered some keg of beefs, cans of pisupo; we accepted. Then after the house was built Tago moved in with his family and lived there and worked on his plantations. Starting from then on we were just like good pals with Tago during those days.

"Q  Was that in 1946?

"A  I think it's after '46 because this was happened in the late part of '46."

Chief Moea'i also testified about this same matter as follows:

"A  On the day that Tago came to our village to check up with our claims then the chiefs gathered together then we told Tago what our damage properties were. Each chief told Tago how much of his plantations were destroyed. Then after all claims were settled then Tago request the chiefs of Faleniu that he wants a place for him to live on this particular land. Then the people of Faleniu told him all right, but wait until we are through with all our claims here and we

can move to another house and have an ava ceremony there and then discuss the matter that you brought up. Then we moved to another house and had our ava ceremony. Then when we're through with the ava then Siufanua was the first one to make a speech. He says let us discuss the point about Tago asked. Then the discussion took place between the chiefs of Faleniu village. Then comes to a conclusion that they all agree to the request presented by Tago at that time. Then it was Siufanua again that told Tago that the village had agreed to your request. Then we went up there to the place and showed Tago this place to live. The village chiefs of Faleniu all of them didn't go except myself, Siufanua and one Filo. And that was the location that Siufanua pointed out to Tago, the location where Tago's house now stands. And that is my verification to the Court."

While there was testimony by Tago that he went upon the land involved by the authority of Fuimaono of New Aoloau (Tago is a member of the Fuimaono Family) we believe the weight of the evidence is to the effect that he took possession of the land late in 1946 pursuant to permission granted by the Chiefs of Faleniu to enter and put in plantations thereon and to put up houses thereon; that the permission to occupy and use the property was to continue as long as Tago should live if he so desired. However, Tago's procurement of the permission from the Chiefs of Faleniu is not inconsistent with his having asked permission of the Fuimaono also.

Tago claims that the land involved in this case (it is a small part of a larger tract known as Tafeata) is the property of the Fuimaono title of Aoloau. He bases the claim of Fuimaono ownership upon an ancient legend originating about 1822 and passed down by word of mouth for over 125 years. The ancient legend is set out in the opinion of this Court in the case of *High Chief Fuimaono by Sianava R. S. Tago v. Moananu and Felila*, No. 12-1955 (H.C. of Am. S.). It need not be repeated here. It is sufficient to say that even if it be conceded (and it is not necessary for us to decide the point) that the part of the land Tafeata involved in this case was the property of the Fuimaono

title, it does not follow that it was still the property of that title when Tago entered upon it late in 1946 after obtaining permission of the Faleniu chiefs to enter.

■ It is quite clear to us from the evidence that the Chiefs of Faleniu had continuous possession of the tract now in dispute for more than 20 years from the time they cut down the big trees on it in 1922 and that their possession was such as to be adverse to any claim of ownership by the Fuimaono. Under these circumstances the ownership of the part of Tafeata involved in this case passed to the Chiefs of Faleniu at the end of the 20 year period of possession which began in 1922. Adverse possession for the statutory period (it is 20 years in American Samoa. See Sec. 907 of the A. S. Code.) vests title in the adverse possessor. *Maxwell Land Grant Co. v. Dawson*, 151 U.S. 586, 607; *Puailoa v. Leapaga*, No. 64-1948 (H.C. of Am. S.) ; *Pelenato Sa Manoa v. Maea et al.*, No. 11-1955 (H.C. of Am. S.). The 20 year period would end in 1942 which was 4 years prior to the entry by Tago through permission of the Chiefs of Faleniu.

We believe, furthermore, from the evidence that when Tago entered late in 1946 there were no plantations on the land, though no doubt the Faleniu Chiefs did have plantations on it prior to and during part of the war.

Tago entered upon the land, cleared it of grass, weeds and small bushes that had grown up on it. He also built a Samoan house on it and a short time thereafter a palagi house, both of which are still standing and being used by Tago and his people. He also put in plantations on the land and greatly improved it.

No difficulty arose between Tago and the Chiefs of Faleniu over the land until 1952. With respect to the start of these difficulties Siufanua testified: "Yes, we were in good terms from then on the first time Tago entered upon the

land up to the time he surveyed the land then he started turning his back towards us." Tago surveyed the land together with certain adjoining land in 1950 and offered it for registration as his own property in 1952.

These difficulties have culminated in this lawsuit and in the Chiefs of Faleniu retaking possession of the lower part of the land. The lower part of the re-possessed part was planted in coconuts by Tago. The upper part thereof was formerly planted with taro and bananas by Tago, but is now planted in taro by Chief Filo of Faleniu. There is a very small patch of taro just above Filo's taro patch which was just recently planted by Tago's people. Tago still has possession of all the land down to Filo's taro patch, which patch begins at a boundary line approximately 275 feet below the lower side of Tago's palagi house on the land.

We find from the evidence that Tago (1) entered upon the land pursuant to and in reliance on permission granted by the Chiefs of Faleniu (2) cleared the land of small growth and put in plantations thereon (3) built a Samoan and a palagi house thereon (4) and still has possession of the land first occupied by him down to Filo's taro patch the upper part of which begins at a boundary line roughly perpendicular to the highway and about 275 feet below the lower side of Tago's palagi house on the land.

We further find that the Faleniu Chiefs have revoked the permission granted to Tago in 1946 to enter upon the land, occupy, and use it and have re-possessed that part extending up to the upper side of Filo's taro patch, the upper boundary of which is a line roughly perpendicular to the adjoining highway. This line is about 275 feet from the lower side of Tago's palagi house. We further find that there was no intention on the part of the chiefs to convey to Tago an interest or estate in the land.

There is no qualified surveyor in Tutuila at the present time and the Court cannot, as a practical matter, order a

survey to be made with a view to describing with greater accuracy the part still occupied by Tago.

Hereinafter in this opinion we shall refer to the part still occupied by Tago as the "upper tract" and the part re-possessed by the Faleniu Chiefs as the "lower tract."

■ In view of our finding that there was no intention on the part of the Chiefs to convey to Tago an interest or estate in the land, we think the permission granted to him to enter upon, occupy, and use it constituted a parol license and not an interest or estate. A license is "An authority to do a particular act or series of acts upon the land of another without possessing any estate or interest therein. *Polley v. Ford*, 190 Ky. 579, 227 S.W. 1007, 1008; *Haas v. Brannon*, 99 Okl. 94, 225 Pac. 931, 936." Black's Law Dictionary (3rd edition). The question then arises as to whether the Chiefs may legally revoke the license after Tago in reliance on it has cleared the land of small growth, improved it, put in plantations and built houses thereon, i.e. after the license has been executed.

Some courts have held that such a license, although not an interest or estate in land, may nevertheless not be revoked. "In many jurisdictions where a licensee has entered under a parol license and has expended money or its equivalent in labor, it becomes irrevocable, and the licensee acquires a right of entry on the lands of the licensor for the purpose of maintaining his structures, or, in general, his rights under his license, and the license will continue for so long a time as the nature of it calls for." 33 Am.Jur. 408 citing *Chesapeake & Ohio Canal Co. v. Ray*, 101 U.S. 522, 25 L.ed. 792 and many other cases.

On the other hand "The courts of many of the states uphold the general rule that a parol license to do an act on the land of the licensor, while it justifies anything done by the licensee before revocation, is nevertheless revocable at the option of the licensor, and this although the intention was

192

to confer a continuing right, and money has been expended by the licensee on the faith of the license." 33 Am. Jur. 410 citing *Hicks Bros. v. Swift Creek Mill Co.*, 133 Ala. 411, 31 So. 947, 57 L.R.A. 720 and a number of other cases.

And "In some cases, the view is taken that under the rule that a license is revocable although expenditures on the faith of it have been made, the licensee is not entitled to compensation for the cost of such expenditures or improvements upon the land of the licensor (citing *Foster v. Browning*, 4 R.I. 47). A majority of the cases, however, support the contrary view. According to these cases, if a license is revocable, the licensee, as between the parties, upon the revocation by the licensor of a license for the use of the latter's real property, is entitled to compensation or reimbursement for expenditures made by the former upon the property on the faith of the license (citing *Wynn v. Garland*, 19 Ark. 23 and many other cases)." 33 Am.Jur. 411.

We think that under the circumstances of this case the license is revocable. We also think that the last mentioned rule declaring that the licensee is entitled to compensation for expenditures made in reliance on the license is more in accordance with the principles of ordinary justice than the rule that he is not.

However, in view of the way of life of the Samoan people and their customs with respect to money, we think that it would be most impractical to require compensation to be made for expenditures in reliance on a license prior to revocation.

The A. S. Code fully recognizes that the common law may not in all respects be suitable to conditions in these islands. In Sec. 1 it is provided that "Laws applicable in American Samoa: The following are declared to be in full force and to have the effect of law in American Samoa:

193

(a) such parts of the Constitution and such laws of the United States of America as shall, by their own force, be in effect in American Samoa; (b) this Code of Laws of the Government of American Samoa, amendments thereto, and executive orders, promulgated by the Governor of American Samoa; (c) so much of the common law of England as is suitable to conditions in American Samoa and not inconsistent with the aforesaid."

■ The Courts of American Samoa have been faced with this same problem before. We have held under circumstances similar to those in this case that the licensee may retain possession of the property and make use of it in accordance with the terms of the license until such time as the value of the use of the property is equal to the value of his expenditures less the value (after they are torn down) of any buildings which he has erected on the land and can remove therefrom when he leaves it. There are cases in which this rule may be impossible to apply because the value of the use of the license over any specified future period within the lifetime of either the licensor or licensee may not equal the expenditure already made in reliance on the license. Such was the case of *Daniel Foster v. Olotoa*, No. 15-1953 (H.C. of Am. S.) in which we applied the rule that a parol executed license could not be revoked.

In the case of *Sa-Leamanai Family and Leasiolagi of Asu for the Fao Family v. Tomasi and Tulei of Iliili*, No. 22-1951 (H.C. of Am. S.) the facts were essentially the same as in the present case. There we said "Inasmuch as we find that Tomasi entered upon the land in accordance with Samoan customs under the authorization of and with the consent of Malama, later confirmed by Vao the matai of the Salemeanai family, we think it would be unjust, even though we do find that the disputed tract is Salemeanai family land, to order Tomasi and Tulei (Tulei was Tomasi's wife) to surrender possession now leaving their

194

plantations, the product of their hard labor, behind for the use of the Salemeanai people." In that case decided on January 29, 1952 the court decreed "that Tomasi and Tulei shall have the right to continue to possess, occupy and use that part thereof (meaning the land involved in the litigation) on which they now have plantations until January 15, 1958, at which time they shall surrender possession of such part together with the then plantations upon it in an unharmed condition to the Salemeanai family."

In the case of *Heirs of Lemeanai Family v. Iosia of Tafuna*, No. 20-1953 (H.C. of Am. S.) similar to the present case we decreed "that Iosia shall have the right to continue to possess, occupy, and use for plantation purposes that part of the land Foganono on which he now has plantations until January 1, 1956 and shall also have the right to continue to use and occupy his houses thereon until January 1, 1956 at which time he shall vacate the land Foganono taking houses with him if he so desires. He shall leave such of his plantations as may be on Foganono on January 1, 1956 in an unharmed condition."

As heretofore stated, the Court viewed the land involved in the instant case before the hearing. We saw what Tago has done in reliance upon the permission (license) given to him by the Chiefs of Faleniu. We saw the lower tract which the Chiefs have reoccupied and the coconut trees planted by Tago and Filo's present taro patch on it. In the light of the testimony and what we saw we think Tago (it must be remembered that the lower tract has already been repossessed by the Chiefs and that they have been benefited by Tago's expenditures and labor on that part) will be made whole despite the revocation if he has possession and use of the upper tract for seven years with the right of removing his houses standing thereon at the expiration of the seven years, at the same time leaving any plantations he may have thereon at that time in an unharmed condition.

195

Accordingly it is ADJUDGED, ORDERED and DE-CREED that Tago shall have the right to continue to occupy, possess, and use for dwelling and plantation purposes the upper tract (i.e. the part of the land in dispute now occupied by him and extending down to Filo's taro patch the upper boundary of which is a line approximately perpendicular to the adjacent highway and which boundary line is approximately 275 feet from the lower side of Tago's palagi house) for seven years from the date of this decree which is Dec. 30, 1955 at which time he shall have the right, if he has not done so before, to remove his houses on said upper tract, leaving any plantations he may have thereon at that time in an unharmed condition. Tago is hereby ORDERED to vacate said upper tract on or before Dec. 30, 1962.

We think under the circumstances of this case that the costs of $25.00 should be divided equally between the parties. Accordingly costs in the sum of $12.50 are hereby assessed against T. Magalei and the other Chiefs of Faleniu who were parties plaintiff with him, the same to be paid within 30 days. And costs in a like amount are hereby assessed against R. S. Tago Sianava, the same to be paid within 30 days.